UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ANTHONY SOBERRI and
CAROLYN A. SOBERRI,

        Plaintiffs,

        v.                                            Case No. 24-C-804

CONSUMER LEGAL GROUP, P.C.,

        Defendant.

---

### DECISION AND ORDER GRANTING MOTION TO DISMISS

---

Plaintiffs Anthony Soberri and Carolyn Soberri sued Defendant Consumer Legal Group, P.C. (CLG), a New York professional corporation, for violations of the Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679, *et seq.*, and the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*, as well as fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, and legal malpractice. The court has jurisdiction over Plaintiffs' CROA claim under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

On motion of the parties, this case has been consolidated with *Soberri v. Great Lakes Law Firm, LLC*, No. 25-C-1065, a case transferred from the Western District of Wisconsin. Both cases are before the court on the defendants' motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although Plaintiffs have asserted the same claims against each defendant based on similar allegations, the contracts on which Plaintiffs' claims are based are different and are governed by different State's laws. To avoid confusion, the court will issue separate decisions in each case, even though the analysis and ultimate conclusion is the same. In this case, because

the court concludes CLG is not a Credit Repair Organization, Plaintiffs' federal claim will be dismissed. With its federal claim gone, Plaintiffs' state law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

## LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint to state a claim upon which relief can be granted. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990); *see* Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and draws reasonable inferences in favor of the plaintiff. *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (citation omitted). Legal conclusions and conclusory allegations that merely recite the elements of the claim, however, are not entitled to this presumption of truth. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009)).

In deciding a Rule 12(b)(6) motion, a court may also consider documents attached to the motion to dismiss if they are referred to in the plaintiff's complaint and are central to his claim. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). If documents attached to a complaint contradict the allegations of the complaint, the document controls. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454–55 (7th Cir. 1998). This rule "prevents a plaintiff from 'evad[ing] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] his claim has no merit.'" *Brownmark Films*, 682 F.3d at 690 (quoting *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)).

## ALLEGATIONS OF THE AMENDED COMPLAINT

In Plaintiffs' amended complaint against CLG, Plaintiffs allege they experienced financial hardship in early 2023. Am. Compl. ¶ 8, Dkt. No. 13. "Due to financial hardship, Plaintiffs were

unable to keep up with their mounting debt." *Id.* ¶ 9. They then "began looking for debt relief companies that could assist them in resolving their debt and improving their credit." *Id.* ¶ 10. Plaintiffs found CLG through their search and contacted CLG to inquire about their services. *Id.* ¶ 11. Plaintiffs allege that during a call with CLG's "agent," the agent represented to Plaintiffs that it would be able to: "(1) resolve Plaintiffs' financial obligations for a significant discount by negotiating with Plaintiffs' creditors; and (2) improve Plaintiffs' credit scores." *Id.* ¶ 13. Plaintiffs allege that CLG further represented to them that it would be able to resolve all of Plaintiffs' obligations for 50% or less than their current balances. *Id.* ¶ 14. CLG advised Plaintiffs that all they would need to do is make monthly payments over a certain period of time and that CLG would utilize the payments to expeditiously resolve their enrolled debts. *Id.* ¶ 13.

In or around April 2023, Plaintiffs formally enrolled approximately $33,650 into CLG's debt settlement program by entering into a contract with CLG for legal and debt resolution services. *Id.* ¶ 17; Services Agreement, Dkt. No. 28-1 at 7. Plaintiffs timely made the required monthly payments of $587 per month for over a year-and-a-half, totaling some $8,500, but they claim that CLG failed to resolve Plaintiffs' debts as quickly as promised or improve Plaintiffs' credit scores. Am. Compl. ¶¶ 18, 21–22, 29. Plaintiffs also allege that despite CLG's assurances that they were communicating with their enrolled creditors and that settlements would soon be reached, CLG failed to resolve any of their debts. *Id.* ¶¶ 20–21. Plaintiffs further allege that they were sued by several creditors for debts that CLG failed to properly address and that CLG denied them legal representation. *Id.* ¶ 31. As a result of CLG's misrepresentations and omissions, Plaintiffs claim they suffered damages, including financial losses, increased debt due to accruing interest, emotional distress, mental anguish, decreased credit score, and loss of money that was paid into CLG's debt resolution program. *Id.* ¶ 35.

3

## ANALYSIS

Plaintiffs' sole federal claim is for violations of the CROA. "Congress passed the [CROA] in 1996 in response to the growing trend whereby 'credit repair' companies used abusive and misleading practices to take advantage of debtors seeking to improve their credit records." *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 749–50 (N.D. Ill. 2011). The statute's purposes are "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b). Toward that goal, the CROA requires certain disclosures to consumers and prohibits, *inter alia*, false or misleading representations of the services they provide to consumers. 15 U.S.C. §§ 1679b(a)(3), 1679c. CLG contends that Plaintiffs' claims under the CROA fail because CLG is not a credit repair organization within the meaning of the CROA.

A "credit repair organization," as defined by the CROA, "means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)." 15 U.S.C. § 1679a(3). To state a claim under the CROA, Plaintiffs must plausibly allege that CLG is a "credit repair organization."

Plaintiffs allege in their amended complaint that "[d]uring a call with Defendant's agent, the agent represented to Plaintiffs that it would be able to: (1) resolve Plaintiffs' financial obligations for a significant discount by negotiating with Plaintiffs' creditors; and (2) improve

4

Plaintiffs' credit scores." Am. Compl. ¶ 12. This allegation, they contend, is enough to show that CLG is a credit repair organization at the pleading stage. The allegation that CLG's services were intended to repair Plaintiffs' credit scores, however, is belied by the very contract they signed with CLG.

In support of their argument that it is not a credit repair organization, CLG relies upon the Services Agreement CLG attached to its brief in support of its motion to dismiss. Dkt. No. 28-1. The Services Agreement states that "Consumer Legal Group PC, a licensed law corporation and its employed and affiliated attorneys (collectively 'CLG') will provide legal services wherein it will represent you in connection with disputes you may have with the creditors listed below (see Enrolled Accounts)." *Id.* at 2. The Services Agreement lists the services that CLG agreed to provide, and none of the services listed includes credit repair. To the contrary, the Services Agreement expressly disclaims any credit repair services. Under the heading "Client Authorization," the Services Agreement provides that:

> [I]t is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit.

*Id.* at 3. The next paragraph under the heading "Description of Services to be Performed," also provides:

> Again, it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit.

*Id.* And, under the heading "Debt Settlement," the Services Agreement states:

> You understand that CLG is not a settlement company and the fees you are paying are for the services of CLG's attorneys. It is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services

5

towards resolving debt may have an effect and impact on Your credit.

*Id.* at 5. And like their Retainer Agreement with Great Lakes Law Firm, Plaintiffs Service Agreement with CLG also included a merger provision that disclaimed any reliance on statements or representations not included in the Agreement. It reads:

> This Agreement constitutes the entire agreement of CLG and You, it being understood and agreed that all prior and contemporaneous representations, statements, understandings and agreements, whether oral/verbal or written, between CLG and You or made on CLG's behalf, at any time, or which were purportedly made on CLG's behalf, concerning the subject matter of this Agreement, the scope of services to be performed, any guarantees or representations as to what CLG will do, are merged into this Agreement, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation. You agree that you have not relied upon any statement or representation, of any kind, made by anyone, whether oral/verbal or written, not embodied in this Agreement made by the other or any third party acting on behalf of the other.

*Id.* at 6.

Because the Services Agreement is referred to in Plaintiffs' amended complaint and is central to its claims against CLG, CLG argues that the court can and should consider it in deciding its motion to dismiss. And because the Agreement makes clear that CLG is not a credit repair organization, CLG contends its motion to dismiss Plaintiffs' claims under the CROA should be granted.

In the face of the clear and unequivocal language of the contract Plaintiffs signed, Plaintiffs' allegation that CLG represented that its services were intended to improve their credit score cannot stand. Their Services Agreement with CLG is central to their claim. That agreement set out in clear terms what services CLG would provide, none of which were improvement of Plaintiffs' credit score. At the same time, the Agreement explicitly listed "credit repair or credit reporting" as services it did not provide. Plaintiffs' allegation that at some point an agent of CLG stated over the phone that the services CLG provided would not only "resolve Plaintiffs' financial

6

obligations for a significant discount by negotiating with Plaintiffs' creditors" but also "improve Plaintiffs' credit scores" does not transform CLG into a credit repair organization.

Plaintiffs cite the Ninth Circuit's decision in *Stout v. FreeScore, LLC*, 743 F.3d 680 (9th Cir. 2014), for the proposition that "a defendant's self-serving disclaimer that it is not a credit repair organization does not cure the representations it made that it offers services that could improve a consumer's credit." Dkt. No. 34 at 6. In *Stout*, the defendant held itself out as a "provider of credit scores, reports and consumer credit information" but explicitly denied that it was a credit repair organization. 743 F.3d at 681, 683. In reversing the district court's dismissal of the plaintiff's CROA claim, the court held that "a person need not actually provide credit repair services to fall within the statutory definition of a credit repair organization." *Id.* at 685. "Instead," the court held, "the person need only represent that it can or will sell, provide, or perform a service for the purpose of providing advice or assistance to a consumer with regard to improving a consumer's credit record, credit history, or credit rating." *Id.* (citing 15 U.S.C. § 1679a(3)(A)). But in *Stout*, the court considered far more than a vague allegation about an agent saying credit scores would improve as a result of the services it offered. As the court explained, Freescore's website advertisements and TV commercial represented that "it provides a service for the purpose of assisting a consumer in improving the consumer's credit record, history or rating." *Id.* The court further elaborated:

> FreeScore affirmatively represents that its services can or will improve, or help to improve, a consumer's credit record, history, or rating. On its FICO information page, FreeScore clearly asks, "So how can you deal with or *improve a FICO® score?*" (emphasis added). The page continues, "Many people take years to micromanage their accounts, *attempting to repair a damaged credit score*, and many find that the best solution is preventative credit maintenance." (emphasis added). The page concludes, "Learning to manage your credit starts with *getting informed about your credit*. That means utilizing services like credit monitoring to find out what may be changing in your credit history report; *those changes can have an immediate effect on your credit score.*" (emphasis added). Accordingly, FreeScore

7

> represents both explicitly and implicitly that its services can improve or assist in improving a consumer's credit record, history, or rating.

*Id.* at 686.

The facts of this case are closer to those of *Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d 969 (N.D. Ill. 2006). In that case, the plaintiff enrolled in a Debt Melt Down Program, similar to CLG's program. The Agreement Letter in that case, like the Services Agreement here, explained that the program was intended to eliminate debt over a period of time through settlement arrangements with creditors. *Id.* at 970. The Agreement Letter further explained:

> This program cannot make any assurances as to the state of your credit while on this program. It is likely that your credit score and rating will deteriorate while on the program. Upon completion of the program, Edge will work with you for 12 months in a best effort rehabilitation of your credit rating.

*Id.* at 970–71. Another letter sent to the consumer stated: "We will make every attempt to minimize any damage to your credit while you are on the program, though it is probable for some deterioration to occur. This is not unusual and we will help modify it upon completion of the program." *Id.* at 971. And in a document titled "Frequently Asked Questions," under the heading "How Does the Program Effect Credit?", the document states:

> While on the program, the credit, will in all likelihood, [sic] suffer damage that occurs when accounts are not being paid. Of course, if you are late or delinquent at present, the difference may be minimal. However, once you are debt free, the accounts will indicate a paid or settled status. Within 6 to 12 months, you will be well on your way to total recovery.

*Id.* Notwithstanding the suggestion that the program could eventually improve the plaintiff's credit score, the court concluded that the defendant was not a credit repair organization. In so ruling, the court explained:

> The allegations of the complaint do not suggest that Edge was a credit repair organization when it provided the Debt Melt Down Program. The Debt Melt Down Program documents make clear that participation in this program will likely result in damage to the participant's credit. They also make clear that the participant's

8

credit is outside the scope of the program. Thus, in offering to provide the Debt Melt Down Program, Edge did not represent or even imply that this program was designed to improve the participant's credit as required for Edge to be a credit repair organization.

*Id.* at 974.

The *Plattner* court also rejected the plaintiff's argument that "the definition of a 'credit repair organization' encompasses any entity that suggests that its services or advice might ultimately result in an improved credit rating." *Id.* "[I]n light of the findings and purposes contained in § 1679, as well as the concerns expressed in the legislative history," the court reasoned, "there is no reason to believe that such a broad definition was intended by Congress." *Id.* at 975. Were the court to accept such an argument, the court concluded, "any entity that endeavored to assist consumers in paying their debts would, because debt payment assistance implicitly improves credit, fall within the scope of this statute." *Id.* To avoid this result, the court construed the statute "to reach such entities whose focus is the improvement or repair of a consumer's credit record, credit history or credit rating, expressly or implicitly, not entities whose activities are aimed at assisting consumers in developing 'creditworthy behavior' and paying their debts, which may result in improved actual credit as a collateral consequence, rather than as a program objective." *Id.*; *see also Walston v. Nationwide Credit, Inc.*, No. 18-C-7877, 2019 WL 4139002, at *4 (N.D. Ill. Aug. 30, 2019) ("Put another way, for an entity to be a credit repair organization, the purpose of the service provided by the entity, and not just the service's incidental effect, must be the improvement or repair of the consumer's credit record.").

The court finds the analysis of *Plattner* persuasive. Even assuming an agent of CLG told Plaintiffs at some point over the phone that participation in CLG's program would improve their credit score, this allegation is not enough to overcome the clear language of the Services Agreement that the services being offered were not credit repair services and that CLG "is not a

9

credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair." Dkt. No. 28-1 at 3. Such a statement, if made, suggests no more than that an incidental effect or collateral consequence of the services offered, if completed, could be improvement in their credit score. This alone does not make CLG a credit repair organization within the meaning of the CROA.

Plaintiffs reference language in the Services Agreement under the heading "Description of Services to be Performed," that reads: "CLG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible." *Id.* But as another court concluded in analyzing the same agreement, "[e]ngaging in debt validation services, like the Defendants did here, does not make them CROs under the CROA, when they did not make any representations about engaging in credit repair services—despite the potential impact of those services on the Plaintiffs' credit or the Plaintiffs' intention when engaging with the Defendants." *Senderovic v. Consumer Legal Grp. PC*, No.3:24-CV-1326 (VAB), 2025 WL 1677807, at *6 (D. Conn. June 13, 2025). This is especially true where immediately following the quoted language, the Services Agreement goes on to say, "Again, it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair." Dkt. No. 28-1 at 3.

In sum, a credit repair organization is one that provides or offers to provide any "service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)." 15 U.S.C. § 1679a(3). The express and implied purpose of the services

CLG offered to "provide legal services wherein it will represent you in connection with disputes you (may) have with the creditors listed below (see Enrolled Accounts)." Dkt. No. 28-1 at 2. The fact that such services could, if successful, improve a person's credit score over time does not transform a law firm into a credit repair organization.

It follows that Plaintiffs' claims under the CROA should be dismissed. And since no federal claims remain and no other basis for federal jurisdiction is asserted, the court relinquishes jurisdiction over Plaintiffs' state-law claims. *See Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("The general rule is that once all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolve them on the merits."). Accordingly, CLG's motion to dismiss (Dkt. No. 27) is **GRANTED**. Plaintiffs' CROA claim (Count I) is dismissed with prejudice. Plaintiffs' state-law claims (Counts II–VII) are dismissed without prejudice. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 11th day of December, 2025.

William C. Griesbach
United States District Judge